UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
23-CR-160 (10)( NEB/JFD)

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S** |
| v. | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF HIS FIRST AMENDMENT** |
| Trevaun Robinson, a.k.a. | ) | **JURY INSTRUCTIONS** |
| Tricky Tre, | ) | |
| | ) | |
| Defendant. | ) | |

Within his <u>Brady</u> motion, Mr. Robinson raised the issue of whether or not the overt acts alleged, coupled with his right to associate with childhood friends and assemble in their life-long neighborhood and attend funerals of loved ones, implicated his First Amendment rights. Docket Entry 961, at pp. 19-20. Our claim continues, with the Constitutional defense we will raise, and the jury instructions we have requested. Mr. Robinson's co-defendants join with this memorandum.

The First Amendment "protects speech and the speaker, and the ideas that flow from each," <u>Citizens United v. Federal Election Commission</u>, 558 U.S. 310, 340 (2009), and "must [be] give[n] the benefit to any doubt to protecting rather than stifling speech." <u>Id</u>. at 327 (citing <u>Federal Election Commission v. Wisconsin Right to Life, Inc.</u>, 551 U.S. 448, 469 (2007)). "If there is a bedrock principle underlying the First Amendment, it is that the government may not

prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414 (1989).

The freedom of speech has a "transcendent value" with attendant "due process implications." Speiser v. Randall, 357 U.S. 513, 526 (1958). As the Supreme Court has long observed, "where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding – inherent in all litigation – will create the danger that the legitimate utterance will be penalized." Id. Once a First Amendment defense is raised, the Government bears the burden of refutation, i.e., that the questioned speech was in fact criminal. Id.

The First Amendment likewise protects the silent freedom of assembly and association. Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) (noting the right to associate in pursuit of "social" and "cultural ends"). That right of assembly is not limited to the neighborhood-night-out block party sponsored by a Sec. 501(c)(3) non-profit.

Courts have viewed the litigant's First Amendment rights with a certain largess. Considered "our leading First Amendment scholar" in his day, Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 152 (1973) (J. Douglas, concurring), Yale professor Thomas I. Emerson cautioned

2

against penalizing what has always meant to be protected:    "Hence the suppression of belief, opinion and expression is an affront to the dignity of man, a negation of man's essential nature.    What Milton said of licensing of the press is equally true of any form of restraint over expression:    it is 'the greatest displeasure and indignity to a free and knowing spirit that can be put upon him.'" Thomas I. Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 877, 879-80 (1962-63) (quoting Milton, Aeropagitica 21 (Everyman's Library ed. 1927)).    Those individuals and/or groups, read the Highs and Lows, which may be considered "deviant" and "lacking any other base," Professor Emerson observed, "must find vindication of their rights primarily in resort to the judicial process."    Id. at 901.    Ergo this memorandum.    Ergo our requested instructions.

RICO enterprise is by definition amorphous, "a group of persons associated together for a common purpose of engaging in a course of conduct."    United States v. Turkette, 452 U.S. 576, 583 (1981).    Thirty-five years ago, in a case from Minnesota, the RICO "pattern of activity" predicate as deemed "both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."    H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241 (1989).    Justice Scalia, in his dissent, observed that "I have no idea what this

3

concept of a 'closed period of repeated conduct' means." Id. at 252.

Twenty-years after H.J. Inc., Boyle v. United States circularly defined a RICO enterprise as "a purpose, relationships among the associates, and longevity sufficient to permit the associates to pursue the enterprise's purpose." 556 U.S. 938, 946 (2009). The decisions within the enterprise "may be made on an ad hoc basis and by any number of methods." Id. at 948. Whatever that sentence means.

In this case, the intersection of the Defendants' First Amendment rights – to speak, to associate, to assemble – nudges up against and into that "closed period of repeated conduct" described in H.J. Inc., and the "relationships among those associated" limned by Boyle. The Third Superceding Indictment's mere presence association-based conduct, alleged in Overt Acts 2, 3, 8, 11, 12, 13, 22, 24, 31, 48, 52, 70, and 189, among others, implicates the Defendants' First Amendment rights. By alleging as specific criminal acts the concomitant right to associate (e.g. Overt Act 189), to assemble (at cemeteries, funerals and memorials) (Overt Acts 15, 22, 70), and to participate in the filming of a rap video (Overt Act 52), the Government has conflated First Amendment protected conduct with an overarching allegation that whatever the association, whatever the reason to assemble, whatever the speech, the combination was a pattern, an enterprise. The case law does not

4

agree.

The intersection of RICO and First Amendment rights was first addressed in National Organization of Women, Inc. v. Scheidler, 510 U.S. 249 (1994), an abortion rights case where the disruptive protesters were sued by the offended clinic, alleging a RICO violation.   Scheidler resolved the question of whether, to be valid under law, a RICO claim had to include proof of economic purpose.   It did not.   Scheidler's continued relevance is to be found in Justice Souter's concurrence, joined by Justice Kennedy.   Justice Souter identified First Amendment implications that "could arise from allowing RICO to be applied to protest organizations . . . ."   Id. at 263.   But his concern was not limited to abortion clinics and the pickets outside that prevented patient care.   For our purposes, may this Court substitute the phrase "protest organizations" with the equally vague description of a "loosely organized" group of Black defendants "organized into a series of subunits, or 'cliques,' that operate somewhat independently of one another."   Govt. Trial Brief at p. 3; Docket Entry 1758 (describing the Highs).

Justice Souter validated our Constitutional claims with the following sentences:   "legitimate free-speech claims may be raised and addressed in individual RICO cases as they arise.   Accordingly, it is important to stress that

5

nothing in the Court's opinion precludes a RICO defendant from raising the First Amendment in its defense in a particular case." Id. at 264. This was because, Justice Souter emphasized, the "somewhat elastic RICO predicate acts may turn out to be fully protected First Amendment activity, entitling the defendant to dismissal on that basis." Id. (emphasis added). "And even in a case where a RICO violation has been validly established, the First Amendment may limit the relief that can be granted against an organization otherwise engaging in protected expression." Id. (emphasis added). Ever prescient, Justice Souter thought "it prudent to notice that RICO actions could deter protected advocacy and to caution courts applying RICO to bear in mind the First Amendment interest that could be at stake." Id. at 265.

We're acting on his invitation, and request instructions that allow the jury to consider the viability of our First Amendment defense. See United States v. Larson, 807 F.Supp.2d 142, 165 (W.D. N.Y. 2011)(noting that whether or not the defendant's conduct is protected by the First Amendment is an issue to be resolved at trial). Without instructions, our jury will be left to decide guilt or non-guilt sans the mandate that the Government refute our defense once raised.

The Justice Souter concurrence can't be read as an outlier. In Camreta v. Greene, 563 U.S. 692 (2011), a qualified immunity civil rights case, the comments

6

of Justices Kennedy and Thomas, dissenting, also peaked our interest.    The

defense of qualified immunity, these Justices noted, is not to be construed

narrowly, adding this apropos posit:    "Nor does it prevent invocation of the

Constitution as a defense against criminal prosecution," Id. at 727, which leads us

to the case Justice Kennedy cites as authority for our constitutional defense, Synder

v. Phelps, 562 U.S. 443, (2011).

In Snyder, Fred Phelps would travel to the funerals of Iraqi war casualties,

and stand before the bereaved family with pickets in hand stating:    "Thank God

for Dead Solders," "God Hates Fags," "God Hates You," and "Thank God for

IEDS."    Id. at 418.    Mr. Phelps, who held up the signs with his daughters and

grandchildren and on behalf of the Westboro Baptist Church, was sued by Albert

Snyder, father of the deceased soldier, for defamation, and intentional infliction of

emotion distress among other torts.    A jury awarded 2.9 million in damages.

The Supreme Court reversed on First Amendment grounds.    Id. at 449-450.

While the Phelps' signs and messages were "particularly hurtful to many,"

and caused "already incalculable grief," Id. at 456, the content was still protected.

Snyder's final paragraph:

> Speech is powerful.    It can stir people to action, move them to
> tears of both joy and sorrow, and – as it did here – inflict great pain.
> On the facts before us, we cannot react to that pain by punishing the
> speaker.    As a Nation we have chosen a different course – to protect

7

even hurtful speech on public issues to ensure that we do not stifle public debate.   That choice requires that we shield Westboro from tort liability for its picketing in this case.

Id. at 460-461 (emphasis added).

There is good reason why Justice Kennedy thought Synder's application to be larger than a Baptist Church's ugly demonstrations.   What is offensive to some is free expression to others.   Our First Amendment claims can't be severed out from the forthcoming trial, deemed irrelevant, the stuff of nothingness with respect to the Third Superseding Indictment.   We're not bringing to the Court's attention a point of law that is supposed to have no meaning.   "The Constitution protects peaceful assembly, even if members of the assembly commit crimes in other contexts."   Antonio J. Califa, "RICO Threatens Civil Liberties," 43 Vanderbilt Law Review, 805, 823 (1990) (citing NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958)).

Notes Professor Califa, for those who engage in "pure speech . . . RICO cannot apply."   Id. at 824.   That "transcendent" value of First Amendment protected conduct is such that "other values and rights are subordinated."   Id. at 832.   By unconstitutional want, the Government here subordinates the Defendants' First Amendment rights with a series of Overt Acts, listed without Constitutional consideration.   Attending a funeral is an act manifesting grief.

8

Standing at a coffin and saying goodbye to a neighborhood friend, the Government has now criminalized.    Driving in a car with an old friend isn't a crime either. Compare Overt Act 102 ("On or about January 21, 2022, Nix was with a Highs member at the Winner Gas station in a vehicle purchased by G. Brown").

What about, the Government will respond, those taunts suggesting violence past and present.    The rap videos with gang signs.    What about those?

The Supreme Court has answered that hollow claim, too.    In the First Amendment milieu, "one man's vulgarity is another's lyric," Cohen v. California, 403 U.S. 15, 25 (1971).    The "governmental officials cannot make principled distinctions in this area."    Id.    Only a jury can.

So it is that the use of "social media, paying tribute to deceases or incarcerated members publicly on social media, wearing clothing with gang-related phrases and tributes to deceased members, and utilizing common hand signs," Govt. Trial Brief at p. 4, can all be considered methods of protected communication, no matter how offensive or foreign to ears belonging to those of another culture, a white dominated suburban place from whence our jurors will be summoned.

In Cohen, the defendant was convicted of "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person . . . by offensive

9

conduct." Id. at 16. Mr. Cohen wore a jacket containing the phrase "F[] the draft." The California Court of Appeals affirmed, finding that "[i]t was certainly reasonably foreseeable that such conduct might cause others to rise up to commit a violent act against the person of the defendant or attempt to forcibly remove his jacket." Id. at 17 (citation omitted).

The Supreme Court reversed. Mr. Cohen's conviction rested upon protected "speech." Id. at 18. "We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated." Id. at 26 (emphasis added). Cohen also affirmed the defendant's right to "speak foolishly and without moderation." Id. (emphasis added) (quoting Baumgartner v. United States, 322 U.S. 665, 673-674 (1944)).

We're also reminded of Watts v. United States, 394 U.S. 705, 708 (1969). There the defendant, upset at an anti-draft rally, announced that "if they ever make me carry a rifle the first man I want to get in my sights is L.B.J." Id. at 706. The defendant's conviction, for threatening the United States President, was reversed. The Government's theory of guilt was "a form of pure speech," that had to be interpreted "with the commands of the First Amendment clearly in

10

mind." Id. at 708. That "[w]hat is a threat must be distinguished from what is constitutionally protected speech." Id. at 708. The defendant's speech may have been "crude" and "offensive," but it was nonetheless constitutionally protected. Id.

Mr. Robinson is not charged with a murder count. But his case, and those of his joined defendants, does feature threats of retribution, which begs the question of how the jury should evaluate them in the First Amendment context. Threats are protected, unless intended. R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992).

For the Supreme Court's more recent discussion of threats, actual or subjectively ethereal, see Elonis v. United States, 575 U.S. 723 (2015). Mr. Elonis's Facebook posts consisting of "graphically violent language and imagery." Id. at 727. He cited not only rap lyrics, but added objectionable photographs where he "was holding a toy knife against his coworker's neck" with the caption, "I wish." Id. Regarding his spouse, he declared, "Did you know that it's illegal for me to say I want to kill my wife?" Id. at 728. He planned, Mr. Elonis said, to "fire a mortar launcher at her house." Id. Mr. Elonis's spouse took the threats seriously. Id. at 728-729. Mr. Elonis was charged and convicted of violating 18 U.S.C. 873(c), transmitting a "threat to injure the person of another."

11

Elonis quotes the defendant's offensive speech at length, Id. at 730-731, while recognizing the distinction between violent utterance and criminality.   The Government's jury instruction that the threat should only be judged by how "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual" was error.   Id. at 730.   The conviction was reversed because the jury had to be aware the threat was actual and intended by Mr. Elonis as such.   Id. at 740.

The Supreme Court reached much the same result two years ago in Counterman v. Colorado, 143 S.Ct. 2106, 2118 (holding there must be proof the declarant knew the threat was actually a threat, and that he "consciously accepted a substantial risk of inflicting serious harm").

The Elonis opinion left, for another case, our defense.   "Given our disposition, it is not necessary to consider any First Amendment issues."   Id. at 740.   Elonis was "unclear as to whether there is a heightened mental state required for the First Amendment's 'true threats' exception to free speech."   Lucy J. Litt, "From Rhyming Bars to Behind Bars:   The Problematic Use of Rap Lyrics in Criminal Proceedings," 92 University of Missouri Kansas City Law Review 121, 124 n. 21 (citing Jessica L. Opila, How Elonis Failed to Clarify the Analysis

12

of 'True Threats' in Social Media Cases and the Subsequent Need for Congressional Response, 24 Mich. Telecom & Tech. L. Rev. 95 (2017)).

Elonis did not undercut NAACP v. Claiborne Hardware Co., which held that "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment."   458 U.S. 866, 921 (1982).   In that case, the Supreme Court made this emphasis:

> Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases.   An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause.   When such appeals do not incite lawless action, they must be regarded as protected speech.   To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open.

Id. at 928 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). We're requesting an instruction that requires the jury make that distinction as well, between a spontaneous and emotional appeal and a lawless action that here did not result from the particular verbiage.   It's a fair question for the jury to answer.

The Eighth Circuit has also recognized the possibility of a First Amendment defense.   In United States v. Parker, 871 F.3d 590 (8th Cir. 2017), an actual threat, made against "government witnesses," was held not to be protected speech.   Id. at 607.   In Parker, the defendant's gravamen email conveyed his instructions to fellow gang members to "smash" the identified informants, and thus were not

13

"idle" threats arguably protected.    Id.

Parker added these considerations, all relevant here:    "As in other First Amendment cases, the court is obligated 'to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."    Id. at 605 (quoting Snyder, 562 U.S. at 453 (quoting, in turn, Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)).    And this as well:    "The First Amendment prohibits punishment of expressing unpopular ideas, 'so long as there is no showing of an intent to incite disobedience' to constitutional laws."    Id. at 605 (quoting Cohen, 403 U.S. at 18).

Rap videos, and Hip-Hop Street language will also be introduced in this case.

Mainstream Rap was featured even at this year's Super Bowl halftime show. The Black community considers rap to be "an art form that often distorts and exaggerates reality."    Lucy Litt, "From Rhyming Bars to Behind Bars:    The Problematic Use of Rap Lyrics in Criminal Proceedings," 92 UMKC Law Review 121 (2023); see also Erik Nielson and Andrea Dennis, Rap on Trial: Race, Lyrics, and Guilt in America (The New Press 2019), at pp. 28-58.    The government's use of Black videos "distorts the art form and heightens the risk of wrongful

14

prosecutions."    Litt at p. 121.    The danger, with respect to Overt Act 52, the rap video shot, in part, in front of Augie's strip club, and where "Lows member Decari Starr was killed in 2010," is that joint dancing and language will be "used to implicate swaths of people who might have some connection to the rap artist, such as appearing in a video, without a substantial body of independent evidence linking each individual suspect to the alleged offense(s)."    Id. at p. 124.    Mr. Robinson appears in that video, but there is no proof of his complicity in the death of Mr. Starr.    Yet, the point of its admission will be to implicate him.

Ms. Litt, in her required reading law review article, points out our concern:

> Still, young people who produce or listen to rap music are often perceived as deviant or dangerous, and this aligns with the adultification and criminalization of young Black and Brown people; indeed, systemic racism in the United States socializes Americans, especially white and privileged Americans, to associate crime and gang activity primarily with young Black and Brown men. Throughout the U.S., many prosecutors (and judges) share this mindset as they pursue convictions — they read rap lyrics into the record during criminal legal proceedings without regard for the context and artistic complexities surrounding the lyrics or the socio-economic pressures that encouraged their creation.

Id. at p. 134.    The jury should be asked to make that necessary distinction.

The Defense is entitled to theory of defense instructions if timely requested, supported by the evidence, and a correct statement of the law.    United States v. Thunder, 745 F.3d 870, 874 (8th Cir. 2014).    Failure to give a supported theory of

15

defense is reversible error.    United States v. Prieskorn, 658 F.2d 631, 636 (8th Cir. 1981)(reversal for refusal to instruct that buyer/seller is a defense to conspiracy); United States v. Casperson, 773 F.2d 216, 222 (8th Cir. 1985)(reversal for refusal to provide a good faith defense instruction).    Once the First Amendment defense is raised, the Government must disprove it by proof beyond a reasonable doubt.    Cf. Sec. 9.04, Eighth Circuit Model Instructions (2024)(when submitted for the jury's consideration, the government's burden is to prove the defendant was not acting in self-defense); Speiser, 357 U.S. at 527 (holding that once the First Amendment defense is raised, the Government has the "burden of persuasion that the [defendants] engaged in criminal speech").

Our instructions are attached with this memorandum.

Dated: April 28, 2025                  Respectfully submitted,

                                       /s/ Paul Engh
                                       PAUL ENGH - Attorney No. 134685
                                       150 South Fifth Street, Suite 2860
                                       Minneapolis, MN 55402
                                       Tel: (612) 252-1100

                                       Attorney for Mr. Robinson and on behalf of
                                       the defendants joined with him at trial

16

DEFENDANTS' REQUESTED INSTRUCTION 1
First Amendment Defense – the Right of Assembly

The Defendants raise a First Amendment Defense to the RICO charges and the Overt Acts alleged.  Purported members of street gangs possess constitutional rights.  You are instructed that there is a First Amendment right that each defendant has to assemble and to associate with one another.  The right of assembly and association includes the right to attend memorials and funerals, to appear in rap videos, and to be with friends and family from the neighborhood in which the Defendants were born and raised.  Put another way, the First Amendment protects the Defendants' rights to assemble and associate to pursue cultural and social ends including friendship.  But the Amendment does not excuse criminal conduct committed during the assembly or association.

Once the First Amendment Defense is asserted, the Government is required to prove, beyond a reasonable doubt, that the Defendants' rights of assembly and association, as charged in the Overt Acts on the Third Superseding Indictment, were not protected by their First Amendment rights.

---

Citizens United v. Federal Election Commission, 558 U.S. 310, 327 (2010) (requiring the defendants be given "the benefit of the doubt" as to their claim of First Amendment defense); Snyder v. Phelps, 562 U.S. 443, 448 (2011)(upholding the defendants' right to utter offensive and hurtful language and assemble while doing so); National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 263 (1994)(Justice Souter concurring, noting the application of First Amendment defense to a RICO allegation); Speiser v. Randall, 357 U.S. 513, 527 (1958) (noting the burden shifting to the Government once the defense is raised).

DEFENDANTS' REQUESTED INSTRUCTION 2
First Amendment Defense – The Right of Free Speech

The Defendants' First Amendment rights include the right to speak freely. The Defendants may not be penalized for their free speech, even if you find the speech to be offensive, obscene, or hurtful to another, or unpopular. What is not protected by the First Amendment are threats that are actual and intended by the Defendant uttering the same. When considering whether the Defendants' speech is protected, you are not to evaluate that speech from the view of how a reasonable person would interpret what is said. The test is not whether or not you, as jurors, would have said the same things using the same language. Rather, you must evaluate an actual or intended threat is a threat where the defendant consciously accepts a substantial risk of inflicting serious harm. The threat cannot be idle. That the Defendant hears of a threat does not mean that the Defendant accepted the threat as his own. Violently graphic language and imagery, stated without the intention to act upon that language, is protected speech. Remember that guilt is individual.

Once the First Amendment Defense is asserted, the Government is required to prove, beyond a reasonable doubt, that the Defendants' rights of free speech, as charged in the Overt Acts of the Third Superseding Indictment, was not protected by their First Amendment rights.

Counterman v. Colorado, 143 S.Ct. 2106, 2118 (2023)(denoting the standard); Elonis v. United States, 575 U.S. 723, 730 (2015)(discussing the requirement of actuality); United States v. Larson, 807 F. Supp. 2d 142, 165 (W.D. N.Y. 2011)(holding the First Amendment defense is to be resolved at trial); National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 263 (1994)(Justice Souter concurring, noting the application of First Amendment defense to a RICO allegation); Speiser v. Randall, 357 U.S. 513, 527 (1958) (noting the burden shifting to the Government once the defense is raised); United States v. Parker, 871 F.3d 590, 605-607 (8th Cir. 2017)(recognizing the First Amendment defense protected unpopular ideas but not actual threats).